IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROY LEE HUMPHREY,<br><br>Petitioner,<br><br>vs.<br><br>RICK HILL, Warden, Folsom State Prison,<br><br>Respondent. | No. 2:12-cv-1494-JKS<br><br>MEMORANDUM DECISION |

Roy Lee Humphrey, a state prisoner proceeding *pro se*, filed a Petition for Writ of Habeas Corpus with this Court pursuant to 28 U.S.C. § 2254.  Humphrey is currently in the custody of the California Department of Corrections and Rehabilitation and is incarcerated at Folsom State Prison in Represa, California.  Respondent has answered, and Humphrey has replied.

## I. BACKGROUND/PRIOR PROCEEDINGS

The California Court of Appeal recounted the facts and procedural background as follows:

### FACTUAL AND PROCEDURAL BACKGROUND

Defendant was charged by information with murder, attempted robbery, and assault with a firearm. ([CAL. PENAL CODE] §§ 187/189, 664/211, 245, subd. (a)(2).)  The information alleged as a special circumstance that the murder was committed in the attempted commission of a robbery and that defendant used a firearm in the commission of the murder and the attempted robbery.  (§§ 12033.53(b), 190.2(a)(17).)  The information also alleged defendant was 17 years old at the time of the crime.

A trial followed during which the jury heard the following evidence.

**The Murder**
***The Poker Game***

One evening in January 2002, Victor Jiminez played poker with four friends: Antonio Jiminez, Bernardo Valdez Silva, Rafael Gonzales, and Artemio Gutierrez.[5] They sat on the porch, around a table that contained about $20 dollars in coins.  A light illuminated the table and the men around it.  Marcelino Jiminez, who owned the house, and his mother were inside.

FN. 5: For the sake of clarity we will refer to the poker players by their first names.

Two young black men on bicycles stopped by the house's front gate.  As the men on the porch played, one of the young men approached and began to talk to Victor and Antonio in English.  The man, about 19 or 20, had cropped braided rows of hair. Bernardo described the young man as weighing about 140 pounds, wearing a black jacket and cap. Antonio described the man as about six feet tall.[6]

FN. 6: At the time of his arrest three months later, defendant was 17 years old, weighed 200 pounds, and stood 5 feet 11 inches tall.

The man asked to play cards, but Antonio said no.  Rafael heard the man say in English, "Give me the money."  Bernardo and Artemio watched the man argue with Antonio and Victor for several minutes.  Because Artemio did not understand English, he did not understand what the stranger was saying.  Others at the table told him the man was asking to play.  Bernardo saw Antonio gesture for the man to leave.

The young man pulled out a black automatic handgun.  Victor reached for the gun and told the man not to shoot.  Antonio grabbed the man around the waist.  Bernardo saw Antonio push the man with his arm.  Antonio and Victor wrestled with the man.  During the struggle, the men broke the house's front window.

Bernardo hit the young man in the head with a chair two or three times.  The man shot his gun toward the porch, hitting Bernardo in the thigh.  Bernardo fell in the doorway.

As Antonio and Victor tried to wrestle the gun away, the man shot Victor at close range.  Victor fell to the side of the door.

Artemio saw a second black man outside the gate of the house.  Rafael told the second man he could not come inside.  In response the second man said, "I'm coming in."  Artemio saw a gun in the man's waistband.  Artemio struggled with the second man and was able to disarm him.  The man dropped the gun and ran away.

Rafael heard the sound of two gunshots coming from the porch.  Rafael chased the second man but turned to see the gunman running from the scene in the same direction.

-2-

***What the Neighbor Saw***

That evening, neighbor Rosa Miramontes heard a commotion outside and four or five gunshots.  Miramontes immediately called 911.  Miramontes saw two black men, in their mid-twenties or younger and wearing dark jackets and jeans, running away.  One ran down the alley; the other ran toward the street.

***What the Police Found***

Officers arrived on the scene at 8:24 p.m.  The crime scene investigator, Scott Williams, found two bicycles by the front gate.  A silver Diamondback Assault 24 BMX leaned against the fence.  A red Rocky Mountain 10-speed leaned against a pickup truck.

Past the gate, in the driveway, Williams found a brown leather jacket, a black knit cap, three wrapped condoms, a five-shot revolver with three rounds in the cylinder, and two .38-caliber rounds on the ground.  Williams also noted a trail of blood leading into the house and a spent bullet on the porch.

Another crime scene investigator found three live .38-caliber bullets inside the revolver on the driveway, and a spent bullet on the porch.  The investigator collected possible blood samples from the driveway and the kitchen floor in the house.

Robert Guitierrez, an identification technician, collected hair samples and fiber samples from a black and white cap found in the pocket of the brown jacket.  He also found possible hair samples on the cap.  Inside the cap he found unknown fibers.

Guitierrez also examined the two bicycles, the black knit cap, the condoms, and the brown jacket for fingerprints.  He obtained six latent prints from the BMX bicycle but none from the Rocky Mountain bike.

On tape wrapped around the revolver Guitierrez found three latent prints.  The revolver had the words "I.N.A. made in Brazil" stamped on it.  The condoms yielded no prints.  None of the prints on the gun matched either defendant's or DeSwan Fisher's fingerprints.

***What Defendant's Sister's Girlfriend Saw***

That January, Danna Easter was involved in a relationship with defendant's sister Michelle.  The couple, along with defendant, lived with defendant and Michelle's mother.

On the afternoon of the shooting, defendant's friend DeSwan Fisher came to the house to show defendant a dog.  Fisher left.  Later, after it became dark, defendant left.  Defendant told Easter he was going to shoot dice.

Earlier that day, Easter saw defendant with a revolver in his hand in the hallway.  Defendant told Easter that Fisher had a gun.  Easter saw Fisher place the gun in his waistband.

Defendant returned three or four hours later, bleeding from his head and leg.  Defendant told Easter and Michelle that he and Fisher had been attacked.  Defendant said

-3-

he fought with a man near St. Paul's Church.  The man hit him on the head and shot him.
Defendant never got a good look at his attacker.  He lost his wallet during the fight.

Defendant told his mother about the fight, and she became hysterical.  She
insisted that Easter and Michelle take defendant to the hospital.[7]  When Easter overheard
defendant relating the story to his mother, defendant did not mention being with Fisher.
Defendant told his mother he blacked out after being hit over the head and was robbed.

FN. 7: Defendant's mother made a 911 call reporting defendant's gunshot wound.

Easter, Michelle, and another sister took defendant to the hospital.  Before they
left, Michelle searched defendant's wallet for his insurance card.

Defendant produced his insurance card at the hospital.  After returning from the
hospital, Easter saw defendant put his wallet in his room.

Easter told a prosecution investigator that defendant told her he went to shoot dice
and "dudes like got into it."  Defendant admitted to Easter that he went to rob some
people and "everything went down."  Defendant also said he had a problem with "some
Mexicans."  The conversation took place after their return from the hospital while
defendant washed his wound.

During cross-examination, Easter acknowledged she was interviewed by police a
few months after the shooting after being arrested on a bench warrant.  Easter testified
that, during the interview with the investigator, she stated what she thought had
happened, based on assumptions and opinions.  She repeated what she had heard from
someone that Mexicans were involved.  Easter also admitted reading newspaper accounts
of the shooting.

Easter was on probation for an assault with a deadly weapon committed in 2003.
Easter, involved in another criminal case out of state, was transported back to California
to testify.

### At the Hospital

An emergency room nurse treated defendant on the night of the shooting.
Defendant stated that he had been hit in the head and shot by an unknown assailant.  The
nurse confirmed defendant had his health insurance card with him at the hospital.

An emergency room physician treated defendant.  Defendant suffered a gunshot
wound in his left calf.  Defendant told the physician he had been assaulted, hit in the back
of the head with something, and lost consciousness.  Defendant ran to his sister's house
and then noticed the leg wound.  The physician also found a laceration at the base of his
skull.  An X-ray revealed multiple bullet fragments lodged in defendant's leg.

A law enforcement officer interviewed defendant at the hospital.  Defendant told
the officer that, following the assault, someone took his wallet containing about $100.
An investigator later photographed defendant's wounds at his home.  At the time
defendant wore his hair in braids.

***DeSwan Fisher's Story***

Fisher, 23, met defendant in 2001.  The day of the shooting, Fisher saw defendant riding his bike in the morning.  Fisher and defendant talked and decided to get together that evening.

Fisher returned to his house, smoked a lot of marijuana, drank some Hennessy, and slept.  Around 6:00 p.m., defendant came to Fisher's house.  The duo left to recover money from "some Asians" who owed defendant money.  Defendant told Fisher there might be problems with the Asians, and they might have to fight them.  Defendant needed the money to buy marijuana.

Defendant rode a burgundy and gold mountain bike; Fisher rode a chrome 20-inch bike.  Fisher wore defendant's leather jacket and a black beanie with a brim.  They left Fisher's house and returned to defendant's house, where defendant retrieved the leather jacket.  Fisher had previously seen defendant wearing the beanie along with some of his friends, including someone named Marcus and "some white looking dude."

The pair then rode their bikes to Jay's apartment, where defendant got a gun from Jay.  Fisher had seen defendant with .38-caliber revolver before.

They rode to the house where the Asians lived.  Defendant went inside for a few minutes; Fisher remained outside.  As they rode home, defendant told Fisher he knew about a place where some guys played cards.  Defendant said he and Fisher might be able to "lick 'em" or "rob them."  Fisher told defendant, "Don't do it."  Instead of responding, defendant continued to ride his bike.

Defendant rode his bike up to the gate of a house.  Fisher saw defendant approach the porch and begin talking to several Mexicans.  Fisher walked up to the gate and asked defendant, "what's up?"  Defendant told Fisher to hold on.

Fisher saw one of the men make a "shooing motion" in an attempt to get defendant to leave.  As Fisher turned his bike around preparing to leave, he heard a commotion.  As Fisher looked toward the porch, one of the men hit him on the forehead with a beer bottle.  Fisher and the man began to fight, and Fisher's jacket came off.

As Fisher ran away, he heard three or four shots.  He ran to his girlfriend's house.  Fisher told his girlfriend and her sister, mother, stepfather, and aunt what had happened.

When Fisher saw defendant a few days later, defendant admitted he probably hurt someone and that someone might have died.  Defendant also told Fisher he had been shot in the leg.  When defendant spoke with Fisher at the Oak Park Community Center after the shooting, he told Fisher not to talk to the police.

A month or two after the shooting, officers contacted Fisher.  Fisher gave a statement over the phone.  Fisher's relatives drove him to the police department the next day.

Officers arrested Fisher for murder and he later entered a plea agreement.  Fisher entered a guilty plea to manslaughter and received a 10-year prison term in exchange for testifying against defendant.  By entering into the plea agreement, Fisher avoided a sentence of life without the possibility of parole.

Fisher identified photos of the bikes found at the scene as the bikes he and defendant rode the night of the shooting.

During cross-examination, Fisher admitted membership in the G Parkway Mile Gang.  Fisher testified he carried a gun the night of the shooting to protect himself from rival gang members.  He denied carrying the weapon to commit a robbery but admitted defendant told him he needed a gun to backup defendant during the robbery.

**Miscellaneous Evidence**

A dismissal slip from defendant's high school indicated he left school at 9:45 the morning of the shooting.  Two months after the incident, officers executed a search warrant at defendant's home.  Officers found a black wallet in defendant's bedroom.  Inside the wallet officers found defendant's Social Security card, his health insurance card, and the early dismissal slip from defendant's high school.

Defendant's neighbor and friend, Christopher Thacker, testified that the month of the shooting, he borrowed a brown leather jacket from defendant.  Thacker stated the jacket he borrowed was the same color as the jacket found at the scene.  About two weeks after Thacker borrowed the jacket, someone came to retrieve it.  The person told Thacker that defendant gave them permission to get the jacket.  According to Thacker, the individual resembled a photograph of Fisher.

Thacker submitted blood and hair samples.  He acknowledged he might have put on the black and white cap found in the jacket, which would explain why his DNA was found on the cap.

**What the Criminalists Found**

Criminalist Faye Springer compared hair samples from defendant and Fisher with hair found on the black and white cap.  Springer described the hairs found on the cap and the brown leather jacket as negroid-type hairs, short light-brown or blond hairs, and reddish-brown head hair.  Springer could not rule out defendant as the source for the negroid hair found in the cap.  Springer sent the hairs, as well as blood samples from Fisher and defendant, to the DNA lab for testing.

Criminalist Edwin Smith analyzed a blood sample taken from the victim (Victor) at the time of his autopsy.  Smith detected no alcohol or narcotics.

Criminalist Michael Saggs determined the spent bullet found at the scene and the bullets found inside Victor could not have been fired by the .38-caliber revolver found on the driveway.  The bullets' characteristics did not match those of the revolver.

**DNA Evidence**
***What Mary Hansen Found***

Mary Hansen serves as the DNA technical lead at the Sacramento Crime Lab. The lab tests nDNA[1], not mtDNA[2]. Hansen has testified as an expert on nDNA many times.

The lab examined several items. A minimal amount of DNA was found on the silver bike. The red bicycle yielded partial DNA from more than one person, with inconclusive results. Only one of the condom packages contained DNA, which did not match any submitted samples.

Hansen testified that Marcelino Jiminez's blood was on the cement and on a condom wrapper found at the scene. Fisher was the source for much of the nDNA found on the black cap. Hansen stated the same nDNA profile as Fisher's would be found at random among unrelated individuals in approximately one in 14 billion of the African-American population, one in 44 billion of the Caucasian population, and one in 70 billion of the Hispanic population.

Thacker was the source for most of the nDNA found on the black and white cap. Thacker's particular nDNA profile was found at random in approximately one in 33 quintillion of the African-American population; one in 2 quintillion of the Caucasian population; and one in 23 quintillion of the Hispanic population.

The brown leather jacket yielded the nDNA of at least three or more individuals. Defendant could not be ruled out as one of the sources.

***What Thomas Fedor Found***

Thomas Fedor, a DNA analyst at the Serological Research Institute, has a Master's degree in cellular and molecular biology. Fedor began mtDNA testing at the institute in 2002.

Fedor tested two blood samples and three hairs for mtDNA. The hairs had the C–C–T pattern matching defendant's C–C–T mtDNA pattern. Defendant's mtDNA was similar to that found on hairs at several other locations.

Fedor determined Fisher could not be the source for the three hairs. Conversely, Fedor found defendant could not be ruled out as a possible source for the three hairs because of his mitochondrial sequence. According to Fedor, the hairs belonged to either defendant, his mother, or someone else with the same maternal line as defendant.

---

[1]     Nuclear DNA.

[2]     Mitochondrial DNA.

**What the Forensic Pathologist Found**

Forensic pathologist Dr. Mark Super performed the autopsy on Victor. An X-ray revealed two bullets lodged in Victor's back. A gunshot wound in Victor's right chest had a surrounding abrasion ring and left a ring of black soot around the skin. The second entrance wound was on Victor's left shoulder. This wound had a muzzle imprint on it, an imprint caused by the gun being placed against the body's surface.

Dr. Super testified the second gunshot wound was fatal and caused Victor to die within a matter of minutes. Super recovered both bullets. Super also testified Victor sustained a third gunshot wound to his left leg. The bullet moved down from Victor's head before entering the leg. According to Super, the two bullets lodged inside Victor could not have gone through another individual first. The bullet that went through Victor's leg could have gone through another person first.

**Defense Case**

In a prior judicial proceeding, defendant denied knowing Fisher. According to defendant, the first time he saw Fisher was in court.

***Defendant's Mother's Testimony***

Defendant's mother, Lisa Humphrey, lived with defendant, her younger son George, her daughter Michelle, and Danna Easter. In January 2002 defendant worked as a caregiver for a woman named Valerie Pitts.

Humphrey testified defendant and Fisher were not friends. She also denied she ever met with Fisher and told him to stay away from defendant. Humphrey also stated Danna Easter became bitter toward their family after she moved out in 2003.

Defendant came home around 7:30 p.m. after he had been mugged. Defendant was wounded in the lower back of his head and in his leg. Humphrey kept all of her children's health insurance cards, and she gave defendant's sister his card when they went to the hospital that evening.

During cross-examination, Humphrey admitted she did not know exactly when defendant returned home because she had been sleeping after receiving a pain shot. Humphrey waited a little while after defendant returned home before calling 911 at 8:59 p.m. The first time she called 911 she got a busy signal. Humphrey also stated defendant had two different wallets. One wallet was stolen during the mugging; the other had been a gift from his sister. According to Humphrey, defendant never owned a brown leather jacket.

***Nautisha Marion's Testimony***

Nautisha Marion met Fisher through her ex-boyfriend, Anthony. Marion stated Anthony was related to Antoinette Cox. In January 2002 Marion often saw Fisher in the

neighborhood where she lived.  Fisher belonged to the G Parkway Mob gang.  When he moved to Oak Park, Fisher became a member of the FAB gang.

The night of the shooting, Marion was in the Cox home when Fisher returned and started talking about what happened.  A man named Ontrice Blackwell was also present. Fisher told Blackwell that Fisher would have to find someone to cover up for Blackwell. Blackwell said he did not mean to shoot anyone; that it had been an accident.  Blackwell was determined not to go to jail for what happened.

Marion also heard Fisher ask Blackwell, "Why [did] you drop the gun?" Blackwell made no reply.  Blackwell later asked Fisher what had happened to Fisher's gun and if he had dropped it.

Marion heard Fisher and Blackwell discuss blaming the shooting on someone who resembled Blackwell.  The duo discussed robbing and shooting someone.  They then talked about blaming the person they had robbed earlier for the later shooting.  Blackwell said they had gone to a place to get methamphetamine when the shooting occurred.

According to Marion, Blackwell was related to Fisher's girlfriend and was a fellow FAB gang member.  Marion described Blackwell as five feet six inches tall, weighing around 170 pounds.

Marion later told defendant's mother about what she had overheard.  Marion's stepmother is a close friend of defendant's mother.  After the trial began, Marion told defense counsel about what she had heard.

During cross-examination, Marion conceded Blackwell is five years older than defendant.  Marion also admitted failing to report the conversation between Fisher and Blackwell to authorities during the four years that defendant remained in custody.

Marion could not explain why Fisher and Blackwell would attempt to frame someone that they had shot and robbed earlier, who might well be in the hospital.  A hospital visit would provide an alibi for a later shooting.  Marion also acknowledged an earlier conviction for grand theft.

### *Testimony of Defendant's Sisters*

Defendant's sister, Earlina Humphrey, testified defendant came to her house around 5:00 on the afternoon of the shooting.  Defendant told Earlina he had been shot and hit in the head.  According to Earlina, defendant had plenty of money from his job and he never carried a gun.  Defendant suffered from a learning disability and could be described as "big and dumb."

Earlina bought defendant a Dockers wallet for Christmas.  She testified this was the wallet stolen when defendant was robbed.

The evening of the shooting, after defendant arrived home, Earlina never thought to call 911.  Instead, her first instinct was to take defendant to her mother's house.

Defendant's other older sister, Michelle Humphrey, testified Fisher was not defendant's friend.  Nor did defendant ever ride a bicycle.

On the day of the shooting, Earlina called Michelle and asked her to come pick up defendant.  Earlina sounded upset.  Michelle estimated Earlina called around 4:00 p.m.

It was still light when Michelle arrived at Earlina's house and light when she returned home with defendant. Michelle noticed defendant walked with a limp. They went in the back door so as not to disturb their mother. Approximately 30 minutes later, Michelle told their mother that defendant had been shot.

Michelle gave defendant a wallet after he had been mugged, and identified it as the wallet found in defendant's room. According to Michelle, she originally gave the wallet to Danna Easter, who later agreed that Michelle should give it to defendant.

### Testimony of Timothy Hayes

The evening of the shooting, Timothy Hayes and his wife Ratasha King went to the Humphrey home after work around 6:00 p.m. Hayes was waiting in the car when King returned and told him defendant had been shot.

Hayes, a trained medical assistant, rewrapped defendant's leg with the same bandage and saw a burned hole in the back of the leg. While he wrapped, Hayes heard someone say an ambulance had already been called. As Hayes and King left about 20 minutes later, he saw the sun setting.

The couple saw officers at a nearby gas station, and Hayes told them someone had been shot. According to Hayes, the officers did nothing but state that if an ambulance had been summoned help was on the way. During cross-examination, Hayes acknowledged a carjacking conviction in 1997.

### Testimony of Michael Cox

The month of the shooting, Michael Cox and his wife Antoinette Cox lived with Fisher, LaToya Washington, and Fisher's son. Michael Cox testified that Blackwell is his wife's great-nephew. Cox and his family had not seen Blackwell in a long time.

Fisher returned home on the night of the shooting around 10:00 or 10:30 and acted nervously. That evening, Michael Cox heard defendant and Fisher talking on the balcony of the house. Fisher asked defendant why he left him, and defendant replied: "I shot the mother fucker." Fisher responded: "[Y]ou still didn't have to leave me." Michael Cox then heard defendant say: "I don't know if I killed the mother fucker, but I shot him."

Michael Cox saw a photograph of his son's bicycle in the flyer describing the shooting. He persuaded Fisher to turn himself in. Cox believed if Fisher turned himself in, he could tell his side of the story.

Before Fisher turned himself in, Michael Cox and Fisher saw defendant as they drove down the street. Fisher got out and spoke with defendant. Cox overheard defendant tell Fisher not to turn himself in. Fisher said he had gotten hit in the head with a bottle and had to wrestle a man off him to get away.

Michael Cox contacted the police and told them Fisher and defendant were involved in a shooting. In return, Cox received a small reward.

Michael Cox acknowledged convictions for spousal abuse, driving under the influence, and receiving stolen property. He was on parole.

-10-

***Testimony of Valerie Pitts***

      Valerie Pitts met defendant after she suffered a stroke.  Defendant often cleaned her home.  On the day of the shooting, defendant was at Pitt's home from 9:45 a.m. to 3:30 p.m.  Defendant cleaned, and then took a long nap.  Pitts later learned that defendant had been shot.  Days after the shooting, Pitts heard that defendant's bike had been stolen.

      During cross-examination, Pitts stated that the morning of the shooting, defendant dropped off a bicycle at her house.  Pitts often saw him riding his brother's bicycle.

***Testimony of Detectives***

      The parties stipulated that, if called as a witness, Detective Toni Sals would testify she interviewed Cox on March 22, 2002.  Cox told Sals that he and his wife arrived home the evening of the shooting around 8:30 or 9:00.  Fisher was already there.  Cox advised Fisher that he needed to take care of the situation because officers would find DNA on the cap where defendant was injured.  The evidence would link the incident to defendant and Fisher.  Cox confronted defendant at a restaurant and asked him why he had involved Fisher.  Cox told defendant he should have warned Fisher that he planned on robbing someone.

      Detective Watson interviewed Fisher, who stated the plan the night of the shooting was to get marijuana, smoke it, and go home.  Fisher subsequently told Watson that defendant planned to play poker with some guys, but if they would not let him play defendant would rob them.

**Rebuttal**

      A Sacramento County dispatcher testified Lisa Humphrey made a 911 call at 8:59 the evening of the shooting.  Lisa Humphrey told the dispatcher her son had been shot in the leg two hours earlier.  Lisa Humphrey did not request medical personnel be sent.

      At 9:40 that evening, Officer Grant was at a gas station when a car pulled into the parking lot.  A woman got out of a car and told Grant that someone had been shot nearby.  Grant informed dispatch.  At the time, Grant was drinking a soft drink.  A dispatcher confirmed that Grant contacted dispatch about the shooting.  Three police units were dispatched to the area.  Officers and a fire truck were unable to locate the victim.

      At 10:20 that evening, dispatchers were notified that defendant was at the emergency room.  An officer was sent to interview defendant.

      The jury convicted defendant on all counts and found all the allegations to be true.  The court sentenced defendant to 25 years to life for murder, plus a 10-year consecutive determinate enhancement pursuant to [California Penal Code] section 12022.53, subdivision (b).  On the attempted robbery count, the court sentenced defendant to the midterm of two years, plus a 10-year consecutive determinative enhancement pursuant to section 12022.53, subdivision (b).  The court also imposed a concurrent four-year term for assault with a firearm, but stayed the term under section 654.  The court ultimately sentenced defendant to an aggregate sentence of 25 years to

-11-

life plus 22 years.

Through counsel, Humphrey directly appealed, arguing: 1) there was insufficient evidence to establish that Humphrey was the gunman; 2) the trial court erred in ruling that the mtDNA was admissible under California's *Kelly* test for admitting scientific evidence;[3] 3) the trial court erred in refusing to allow defense counsel to impeach Fisher with prior crimes of moral turpitude; 4) the trial court erred in refusing to allow defense counsel to impeach Easter with misdemeanor convictions for assault with a deadly weapon and prostitution; 5) the court erred in admitting hearsay of Rafael Garcia; 6) California Criminal Jury Instruction ("CALCRIM") No. 318 erroneously permitted the jury to consider prior statements of a witness as substantive evidence without requiring the jury to find inconsistency; 7) the court abused its discretion in failing to provide an interpreter for witness Antonio Jimenez; 8) the court erred in failing to instruct on lesser included offenses; 9) the court erred in failing to give a unanimity instruction on the attempted robbery account which alleged multiple victims; 10) the sentence for attempted robbery and a firearm enhancement were unauthorized as violative of the prohibition against multiple punishments; 11) the imposition of the upper term on Count 3 was unauthorized because the court selected the term without a jury finding of fact which would support it; 12) the imposition of restitution to compensate the victim's wife for wages lost while attending trial was unauthorized; 13) the conviction should be reduced to second-degree murder pursuant to *People v. Dillon*, 34 Cal. 3d 441, 450 (Cal. 1983); and 14) the abstract of judgment

---

[3]       *People v. Kelly*, 549 P.2d 1240, 1244 (Cal. 1976) (adopting the test for determining the underlying reliability of new scientific techniques as set forth in *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923)).

should be corrected to credit Humphrey for an additional two days of time that he served
between his arrest and sentencing.

The Court of Appeal ordered the abstract to be corrected to account for an additional two
days of custody credit and affirmed on all other grounds.

Through counsel, Humphrey filed a petition for review with the California Supreme
Court, arguing: 1) there was insufficient evidence to establish that Humphrey was the gunman;
2) the trial court erred in ruling that the mtDNA evidence was admissible under California's
*Kelly* test for admitting scientific evidence; 3) the trial court erred in refusing to allow defense
counsel to impeach Fisher with prior crimes of moral turpitude; 4) the trial court erred in
refusing to allow defense counsel to impeach Easter with misdemeanor convictions for assault
with a deadly weapon and prostitution; 5) CALCRIM No. 318 erroneously permitted the jury to
consider prior statements of a witness as substantive evidence without requiring the jury to find
inconsistency; 6) the court abused its discretion in failing to provide an interpreter for witness
Antonio Geminis; 7) the court erred in failing to give lesser included offense instructions; 8) the
court erred in failing to give a unanimity instruction on the attempted robbery account which
alleged multiple victims; 9) the imposition of the upper term on Count 3 was unauthorized
because the court selected the terms without a jury finding of fact which would support it; 10)
the imposition of restitution to compensate the victim's wife for wages lost while attending trial
was unauthorized and constituted a penalty for exercising his right to a trial; and 11) his sentence
amounted to cruel and unusual punishment.

The California Supreme Court summarily denied review.

Humphrey filed a petition for writ of habeas corpus with the Sacramento County Superior Court arguing that the restitution order violated his right to due process.

The superior court denied Humphrey relief in a reasoned opinion.

Humphrey timely filed a Petition for Writ of Habeas Corpus with this Court on May 1, 2012.

## II. GROUNDS RAISED

In his Petition filed with this Court, Humphrey argues as follows: 1) the trial court erred in admitting the mtDNA evidence; 2) CALCRIM No. 318 erroneously permitted the jury to consider prior statements of a witness as substantive evidence without requiring the jury to find inconsistency; 3) there was insufficient evidence to identify Humphrey as the gunman; 4) the trial court's refusal to allow impeachment of Fisher and Easter with prior criminal conduct violated his rights to confrontation and to a fair trial; 5) the failure to provide an interpreter for Antonio Jimenez amounted to denials of due process, an accurate determination of guilt, and meaningful confrontation and cross-examination; 6) the court erred in failing to give lesser included offense instructions; 7) the court erred in failing to give a unanimity instruction for attempted robbery, which alleged multiple victims; 8) the selection of the upper term on Count 3 violated *Apprendi/Blakely/Cunningham*[4] because "aggravation" was not found by the jury; 9) the imposition of restitution constituted a punishment for the exercise of his right to a trial; and 10) his sentence amounted to cruel and unusual punishment.

---

[4]  *Apprendi v. New Jersey*, 530 U.S. 466 (2000); *Blakely v. Washington*, 542 U.S. 296 (2004); *Cunningham v. California*, 549 U.S. 270 (2007).

### III. STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2).  A state-court decision is "contrary" to federal law "if the state court applies a rule that contradicts the governing law set forth" in controlling Supreme Court authority or "if the state court confronts a set of facts that are materially indistinguishable from a decision" of the Supreme Court but nevertheless arrives at a different result.  *Williams v. Taylor*, 529 U.S. 362, 406 (2000).

The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the relevant state-court decision," *Williams*, 529 U.S. at 412, and not circuit precedent, *see Renico v. Lett*, 559 U.S. 766, 778-79 (2010).  The holding must also be intended to be binding upon the states; that is, the decision must be based upon constitutional grounds and not on the supervisory power of the Supreme Court over federal courts.  *Early v. Packer*, 537 U.S. 3, 10 (2002).  Thus, where holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'"  *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (citation omitted).

In applying these standards in habeas review, this Court reviews this "last reasoned decision" by the state court.  *Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991).  Under AEDPA, the

state court's findings of fact are presumed to be correct unless the petitioner rebuts this

presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *see also Miller-El v.*

*Cockrell*, 537 U.S. 322, 340 (2003).

## IV. DISCUSSION

**Claim One: Admission of mtDNA evidence**

Humphrey first argues that the trial court erred in admitting the mtDNA evidence under

California's *Kelly* standard.  Pet. at 6.  Humphrey argues that there is no generally accepted

technique for calculating population frequencies using the FBI database.  Pet. at 6.  He further

argues that the government used "statistical alchemy" to generate a population frequency.  Pet. at

6.

The California Court of Appeal denied Humphrey relief on this claim, concluding in a

reasoned opinion that the trial court did not err in denying his *Kelly* objection. LD 5 at 29-48.

 In *Kelly*, 549 P.2d at 1244, the California Supreme Court reaffirmed that, in California,

the test for admissibility of expert testimony based on the application of a new scientific

technique comported with what was then the federal test, as set forth in *Frye*, 293 F. at 1015.

Under the *Kelly* standard, the advocate of a new science method must establish that: 1) the

reliability of the method is generally accepted; 2) the expert witness is qualified; and 3) the

correct scientific procedures were used.  *Kelly*, 549 P.2d at 1244.  The *Frye* test has since been

superceded as to admissibility of scientific evidence in federal courts by the test announced in

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 594-95 (1993).

Because this is a federal habeas corpus case, this Court cannot determine whether the

expert testimony was properly admitted under state law, *see Estelle v. McGuire*, 502 U.S. 62, 67-

68 (1991), and will not consider whether the evidence passed muster under the Federal Rules of Evidence or *Daubert*, which was not decided on constitutional grounds, *see Wilson v. Sirmons*, 536 F.3d 1064, 1101-02 (10th Cir. 2008) ("*Daubert* does not set any specific constitutional floor on the admissibility of scientific evidence."); *Kinder v. Bowersox*, 272 F.3d 532, 545 n.9 (8th Cir. 2001) ("*Daubert* does not bind the states, which are free to formulate their own rules of evidence subject only to the limits imposed by the Constitution."); *Adams v. Jacquez*, No. 2:10-cv-2266, 2011 WL 3563158, at *20 (E.D. Cal. Aug. 11, 2011) (court may not determine whether admission of evidence under *Kelly* standard warranted habeas relief because it was a matter of state law and, in any event, admission did not render trial fundamentally unfair); *Orozco v. Kramer*, No. CV-08-3291, 2009 WL 1033610, at *9 (C.D. Cal. Apr. 14, 2009) ("The *Kelly-Frye* rule is a creature of California law, based on a state court ruling adopting the reasoning of a federal circuit court, which was not based on the United States Constitution.").

State evidentiary rulings are not cognizable in a federal habeas proceeding unless the admission of the evidence violated the petitioner's due process right to a fair trial. *Estelle*, 502 U.S. at 68. In order to prevail, Humphrey must show that the court's ruling was so prejudicial that it rendered his trial fundamentally unfair. *Id.* Although Humphrey argues that the admission of the evidence violated the due process requirement of "fairness" in identification procedures, he may not transform a state-law issue into a federal one merely by asserting a violation of due process. *Langford v. Day*, 110 F.3d 1380, 1389 (9th Cir. 1996). Humphrey is therefore not entitled to relief on this claim.

Claim Two: CALCRIM No. 318

Rafael Gonzalez told a detective on the night of the incident that the intruder said in English, "Give me the money."  At trial, Gonzalez testified that he could not recall making that statement to the detective.  The court gave CALCRIM No. 318, which instructs that a prior inconsistent statement made by a witness may be admissible to both evaluate a witness's credibility and also as evidence that the information in those earlier statements is true.  *See* CALCRIM No. 318.  Humphrey argues that "CALCRIM No. 318 erroneously permit[ted] the jury to consider prior statements of a witness as substantive evidence without requiring the jury to find inconsistency."  Humphrey asserts that California Jury Instructions, Criminal ("CALJIC") No. 2.13 is actually the "proper statement of law" with regards to the use of prior inconsistent statements, and that "[t]o the extent that CALCRIM No. 318 deviates from CALJIC No. 2.13 by denying the defendant the same jury determination of the issue of inconsistency, it must be deemed erroneous.  Where State law requires a jury determination, error in failing to submit the issue to the jury implicates federal due process rights."

The Court of Appeal denied Humphrey relief on this claim, concluding that, under state law, CALCRIM No. 318 correctly instructed the jury on the use of prior statements.

As an initial matter, because Rafael testified and was subject to cross-examination, there was no violation of the Confrontation Clause.  *United States v. Owens*, 484 U.S. 554, 560 (1988).  Any hearsay problem is solely an issue of state law.  *Cf. Crawford v. Washington*, 541 U.S. 36, 61 (2004) (no hearsay problem if witness testifies and may be cross-examined about out-of-court statements).

In addition, insofar as Humphrey is claiming instructional error under state law, state law error in itself does not support a claim for federal habeas relief.  *Estelle*, 502 U.S. at 71-72 ("[T]he fact that [an] instruction was allegedly incorrect under state law is not a basis for habeas relief.") (citing *Marshall v. Lonberger*, 459 U.S. 422, 438 n.6 (1983) ("[T]he Due Process Clause does not permit the federal courts to engage in a finely tuned review of the wisdom of state evidentiary rules.")).  Rather, the only question before this Court on habeas review is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process."  *Id.* (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)).  Humphrey does not allege any deprivation of due process, nor has this Court found any on its own review.  Moreover, CALCRIM No. 318 does not compel the jury to accept out-of-court statements as true, and does not reduce the level of proof necessary for the government to carry its burden.  *See, e.g.*, *Solorzano v. Small*, No. 1:08-cv-01949, 2012 WL 1076099, at *20 (E.D. Cal. Mar. 29, 2012) (rejecting petitioner's claim that giving CALCRIM No. 318 instead of CALJIC No. 2.13 violated his right to due process where CALCRIM No. 318 did not compel the jury to accept out-of-court statements as true and did not reduce the level of proof necessary for the government to carry its burden).  Humphrey is therefore not entitled to relief on his instructional error claim.

Claim Three: Insufficient evidence to identify Humphrey as the gunman

Humphrey next argues that the evidence was insufficient to establish that he was the gunman because Fisher's testimony "was contradicted by other prosecution evidence," and the only other evidence identifying Humphrey as the gunman "consisted of prior inconsistent statements."  "Given the lack of accomplice corroboration and the lack of evidence which would

permit the jury to credit prior statements over sworn testimony the overall case was so fraught with uncertainty as to preclude a confident determination of guilt beyond a reasonable doubt."

The Court of Appeal denied Humphrey relief on this claim, concluding that there was sufficient evidence to corroborate Fisher's accomplice testimony.

The requirement under California Penal Code § 1111 that "'a conviction cannot be had upon the testimony of an accomplice unless it be corroborated' is a matter of state law, which does not implicate a federal constitutional right." *Barco v. Tilton*, 694 F. Supp. 2d 1122, 1136 (C.D. Cal. 2010). No such corroboration requirement exists under federal law. *See United States v. Necoechea*, 986 F.2d 1273, 1282 (9th Cir. 1993) ("The uncorroborated testimony of an accomplice is sufficient to sustain a conviction unless it is incredible or insubstantial on its face."). Accordingly, this Court is bound by the Court of Appeal's interpretation of state law. *Langford*, 110 F.3d at 1389.

In any event, Humphrey's claim must fail because he misperceives the role of a federal court in a habeas proceeding challenging a state-court conviction. As articulated by the Supreme Court in *Jackson*, the constitutional standard for sufficiency of the evidence is whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in the original); *see McDaniel v. Brown*, 558 U.S. 120, 132-33 (2010) (reaffirming this standard). This Court must therefore determine whether the Court of Appeal unreasonably applied *Jackson*. In making this determination, this Court may not usurp the role of the finder of fact by considering how it would have resolved any conflicts in the evidence, made the inferences, or considered the evidence at trial. *Jackson*, 443 U.S. at 318-

19.  Rather, when "faced with a record of historical facts that supports conflicting inferences,"

this Court "must presume—even if it does not affirmatively appear in the record—that the trier

of fact resolved any such conflicts in favor of the prosecution, and defer to that resolution."  *Id.*

at 326.

It is a fundamental precept of dual federalism that the States possess primary authority

for defining and enforcing the criminal law.  *See Engle v. Isaac*, 456 U.S. 107, 128 (1982).

Consequently, although the sufficiency of the evidence review by this Court is grounded in the

Fourteenth Amendment, it must take its inquiry by reference to the elements of the crime as set

forth in state law.  *Jackson*, 443 U.S. at 324 n.16.  A fundamental principle of our federal system

is "that a state court's interpretation of state law, including one announced on direct appeal of the

challenged conviction, binds a federal court sitting in habeas corpus."  *Bradshaw v. Richey*, 546

U.S. 74, 76 (2005); *see West v. AT&T*, 311 U.S. 223, 236 (1940) ("[T]he highest court of the

state is the final arbiter of what is state law.  When it has spoken, its pronouncement is to be

accepted by federal courts as defining state law . . . .").  "Federal courts hold no supervisory

authority over state judicial proceedings and may intervene only to correct wrongs of

constitutional dimension."  *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 345 (2006) (quoting *Smith*

*v. Phillips*, 455 U.S. 209, 221 (1982) (internal quotation marks omitted)).

Under *Jackson*, the role of this Court is to simply determine whether there is any

evidence, if accepted as credible by the jury, sufficient to sustain conviction.  *See Schlup v. Delo*,

513 U.S. 298, 330 (1995).  In this case, the Court of Appeals determined that there was sufficient

evidence identifying Humphrey as the person who shot and killed Victor.  Among other things,

the appellate court noted that Humphrey's mother's 911 call stating that Humphrey had been

shot comported with the time frame of the shooting; Humphrey's injuries were consistent with the descriptions of witnesses to the fight; Easter testified that she saw Humphrey and Fisher with guns on the day of the shooting, and that after returning from the hospital, Humphrey told her that he "got into it" with some "dudes"; Antonio identified Humphrey as the shooter in a prior judicial proceeding; Humphrey wore braids at the time of the incident, which was consistent with a description of the shooter; and DNA evidence linked both Humphrey and Fisher to the crime scene. Although it might have been possible to draw a different inference from the evidence, this Court is required to resolve that conflict in favor of the prosecution. *See Jackson*, 443 U.S. at 326. Humphrey bears the burden of establishing by clear and convincing evidence that these factual findings were erroneous. 28 U.S.C. § 2254(e)(1). He has failed to carry such burden. The evidence in the record does not compel the conclusion that no rational trier of fact could have found that Humphrey was not the shooter, especially considering the double deference owed under *Jackson* and the AEDPA. Humphrey is therefore not entitled to relief on his legal sufficiency claim.

Claim Four: Failure to permit the impeachment of Fisher and Easter

Humphrey next argues that the trial court's refusal to allow him to impeach Fisher with juvenile conduct involving burglary, grand theft, and receiving stolen property, and to impeach Easter with misdemeanor convictions for assault with a deadly weapon and prostitution, violated his right to confrontation and his right to a fair trial. Humphrey asserts that Fisher and Easter provided testimony essential to the prosecution, and "[t]he impeachment which was disallowed would have produced 'a significantly different impression' of their credibility."

The Court of Appeal concluded the trial court erred in refusing to allow the impeachment of Fisher with his conduct as a juvenile, which "amounted to a violation of [Humphrey's] constitutional right of confrontation as well as his right to present a complete defense." The court nevertheless found that the error was harmless because, when viewed as a whole, defense counsel's cross-examination significantly damaged Fisher's credibility. The court concluded that the trial court acted within its discretion in excluding Easter's prostitution conviction because it "would add little to the jury's impression of Easter's credibility" where the jury was already aware that Easter had spoken to police after being arrested and that she was on probation for misdemeanor assault with a deadly weapon.

The Confrontation Clause of the Sixth Amendment guarantees a criminal defendant the right "to be confronted with the witnesses against him." U.S. CONST. amend. VI. The Supreme Court has explained that the right of confrontation "means more than being allowed to confront the witness physically," and that "[t]he main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination." *Davis v. Alaska*, 415 U.S. 308, 315-16 (1974) (citation omitted). The Confrontation Clause does not prevent a trial court from imposing "reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986). Nevertheless, the Supreme Court has held that a defendant's Confrontation Clause rights have been violated where he is "prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby 'to expose to

the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness.'" *Id.* at 680 (quoting *Davis*, 415 U.S. at 318).

Here, Humphrey's right to confrontation was violated when defense counsel was not permitted to cross-examine Fisher about his conduct as a juvenile involving burglary, grand theft, and receiving stolen property.  Fisher's testimony, as an accomplice to the crime in a case turning largely on circumstantial evidence, was key to the prosecution's case.  Cross-examination of Fisher about his misconduct as a juvenile was clearly relevant to impeach him and thus allow the jury to evaluate the credibility of his testimony.  *See Davis*, 415 U.S. at 317-18 (right to confrontation violated where defendant was prevented from cross-examining "crucial witness" about the fact that he was on probation at the time of trial for burglarizing two cabins as a juvenile); *Holley v. Yarborough*, 568 F.3d 1091, 1099 (9th Cir. 2009).

However, the Court of Appeal's determination that the violation of Humphrey's right to confrontation was harmless error was neither contrary to, nor an unreasonable application of, federal law.  Confrontation Clause errors are subject to harmless error analysis.  *Slovik v. Yates*, 556 F.3d 747, 755 (9th Cir. 2009).  "[I]n reviewing state court decisions for harmless error in the context of habeas petitions, federal courts review to determine if the error had 'a substantial and injurious effect or influence in determining the jury's verdict.'"  *Id.* (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993)).  "If a habeas court is left with 'grave doubt' about whether a constitutional error substantially influenced the verdict, then the error was not harmless."  *Parle v. Runnels*, 387 F.3d 1030, 1044 (9th Cir. 2004) (citation omitted).

Here, no "grave doubt" exists as to whether the violation of Humphrey's right to confrontation substantially influenced the verdict, largely because of the extent of cross-

examination otherwise permitted by the court.  A review of the record indicates that a reasonable jury would not have received a significantly different impression of Fisher's credibility had defense counsel been permitted to pursue his proposed line of cross-examination.  On cross-examination, Fisher testified, among other things, that as a result of the incident with Humphrey, he had been charged with murder and that he potentially faced life without the possibility of parole or possibly the death penalty.  However, he pled guilty to voluntary manslaughter and agreed to testify for the prosecution in exchange for a stipulated sentence of 10 years' imprisonment, of which he would serve 8.  He acknowledged that he changed his statements to police several times, and had originally falsely denied that he had a gun.  Fisher also testified that one of the police officers had threatened to take away his son.  Fisher further testified that Humphrey's mother owned a house that Fisher's girlfriend's family had lived in, and that a month before the incident, Humphrey's mother kicked them out and refused to return a vehicle that had been parked there.  Fisher additionally testified that after the incident he heard that Humphrey was claiming that Fisher was the one who had shot him in his leg.  About 30 minutes after confronting Humphrey about his claim, Fisher went to the police and informed them that Humphrey was involved in the shooting.  Fisher was a gang member, and on the day of the incident, he smoked approximately an ounce of marijuana and drank about a pint of Hennessy.

As the Court of Appeal noted, the cross-examination, when viewed cumulatively, painted Fisher "as a drug-dealing, armed gang member, not a trustworthy law-abiding citizen."  "In addition, defense counsel extensively impeached Fisher with his inconsistent statements, motives to lie, and incentive to frame defendant to save his own skin."  When viewed as a whole, the cross-examination of Fisher, without reference to his conduct as a juvenile, left the jury with

-25-

sufficient information to assess his credibility, and the trial court's error was accordingly

harmless.  *See Van Arsdall*, 475 U.S. at 684 (in considering whether an improper denial of a

defendant's opportunity to impeach a witness for bias was harmless error, a court may consider,

*inter alia*, the extent of cross-examination otherwise permitted); *cf. Holley*, 568 F.3d at 1099

("The trial court's decision to completely limit [the witness's] cross-examination to exclude *any*

testimony regarding [bias] . . . was both unreasonable and disproportionate.") (emphasis added).

     Nor was the Court of Appeal's determination that the trial court did not err in limiting the

impeachment of Easter contrary to, or an unreasonable application of, established federal law.

First, as noted above, the Confrontation Clause does not prevent a trial court from imposing

"reasonable limits on such cross-examination based on concerns about, among other things,

harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is

repetitive or only marginally relevant."  *Van Arsdall*, 475 U.S. at 679.  Second, as the Court of

Appeal noted, the jury was already aware that Easter had spoken to police after being arrested

and that she was on probation for an assault with a deadly weapon, and accordingly the impact of

the prostitution would not have contributed significantly to an evaluation of Easter's credibility.

Humphrey is therefore not entitled to relief on this claim.

Claim Five: Failure to provide an interpreter for a witness

     Humphrey argues that the failure of the trial court to provide an interpreter for Antonio

Geminis "was an abuse of discretion which was prejudicial to [his] right[s] to due process, a fair

trial, an accurate determination of guilt, as well as meaningful confrontation and cross

examination."

-26-

The Court of Appeal denied Humphrey relief on this claim, concluding that, without an interpreter, Antonio answered complicated questions, generally answered "without hesitation and with seeming comprehension," and requested clarification as needed.  His answers did not reflect a lack of English comprehension, but rather stemmed from the way the questions were phrased.  The appellate court concluded that the trial court did not abuse its discretion in declining defense counsel's request for an interpreter for Antonio.

Although the Ninth Circuit has held that a defendant has a right to an interpreter in certain circumstances, *see United States v. Si*, 333 F.3d 1041, 1043 (9th Cir. 2003) (per curiam), the United States Supreme Court has not yet recognized a constitutional right to a court-appointed interpreter, *id.* at n.3,  much less extended any such right to a witness, *see Nguyen v. Tilton*, No. 06-01414, 2009 WL 839278, at *19 (N.D. Cal. Mar. 30, 2009) (denying habeas claim that witness was improperly denied an interpreter because there is no clearly established federal law establishing any such right to an interpreter to a witness).  Given the absence of Supreme Court authority on the issue, this Court cannot say that the decision of the Court of Appeal was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Musladin*, 549 U.S. at 77.

In addition, the provision of an interpreter is generally within the trial court's discretion. *Si*, 333 F.3d at 1043 n.3 (citing *Perovich v. United States*, 205 U.S. 86, 91 (1907)).  Even if the trial court abused its discretion in denying defense counsel's request for an interpreter, such error does not warrant habeas relief.  Although the Ninth Circuit has suggested that an abuse of

discretion may amount to a constitutional violation, *see Schell v. Witek*, 218 F.3d 1017, 1025 (9th Cir. 2000) (en banc), the Supreme Court has never held that abuse of discretion is an appropriate basis for granting federal habeas relief.[5]  Indeed, quite to the contrary, the Supreme Court has strongly suggested that, while abuse of discretion is an appropriate standard on direct review, in a federal habeas proceeding it is not.  *Renico*, 559 U.S. at 772-73 ("It is not even whether it was an abuse of discretion for her to have done so—the applicable standard on direct review.  The question under AEDPA is instead whether the determination of the Michigan Supreme Court that there was no abuse of discretion was "an unreasonable application of . . . clearly established Federal law." (quoting § 2254(d)(1))).  Humphrey is therefore not entitled to habeas relief on this ground.

Claim Six: Failure to instruct on lesser-included offenses

Humphrey next argues that he "was convicted of first degree felony murder because the jury was given an all-or-nothing choice."  According to Humphrey, given that the evidence of attempted robbery was weak, "lesser offenses were far more appropriate" and the trial court erred in failing to give lesser included offense instructions.

The Court of Appeal denied Humphrey relief on this claim, concluding that the evidence did not support giving lesser included offense instructions.

---

[5]        At one time, the Ninth Circuit viewed a state court ruling to be "objectively unreasonable" if it amounted to a clear error.  *Van Tran v. Lindsey*, 212 F.3d 1143, 1152-54 (9th Cir. 2000).  This is the test the Ninth Circuit uses in reviewing a trial court decision under the abuse of discretion standard.  *United States v. Ressam*, 679 F.3d 1069, 1086 (9th Cir. 2012) (en banc).  The Supreme Court noted *Van Tran's* statement of the test and expressly rejected it as inappropriate under the AEDPA.  *Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003) (clear error standard is insufficiently deferential to state courts).

Instructional errors at a state court trial are matters of state law and usually do not implicate the federal constitution. *See Estelle*, 502 U.S. at 72. The United States Supreme Court has expressly declined to decide whether due process requires lesser included instructions to be given in non-capital cases, *Beck v. Alabama*, 447 U.S. 625, 638 n.14 (1980), and the Ninth Circuit has declined to extend the holding of *Beck*, which requires lesser included offense instructions supported by the evidence in capital cases, to non-capital cases, *see Solis v. Garcia*, 219 F.3d 922, 929 (9th Cir. 2000) (the "failure of a state court to instruct on a lesser offense [in a non-capital case] fails to present a federal constitutional question and will not be considered in a federal habeas corpus proceeding." (quoting *Bashor v. Risley*, 730 F.2d 1228, 1240 (9th Cir. 1984)). Although a criminal defendant may suffer a due process violation if the court's failure to give a requested instruction prevents a defendant from presenting his theory of the case, *Bashor*, 730 F.2d at 1240, Humphrey makes no such argument here. Again, given the absence of Supreme Court authority on the issue, this Court cannot say that the decision of the Court of Appeal concluding that any lesser included offense instructions were not supported by the evidence was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Musladin*, 549 U.S. at 77. Humphrey is therefore not entitled to relief on this claim.

<u>Claim Seven: Failure to give unanimity instruction for attempted robbery count alleging multiple victims</u>

Humphrey next argues that, according to the prosecution's theory of the case, he attempted to rob a card game which five players attended. However, Count 2 only names Victor

and Bernardo, the two victims who were shot, as victims of the attempted robbery.  Humphrey

argues that "[w]hen two victims are named in the accusatory pleading, jurors must be given a

unanimity instruction to ensure that all jurors agree on the same victim."

The Court of Appeal denied Humphrey relief, concluding that "the jury could reasonably

conclude defendant's demand for the money encompassed money belonging to all the victims at

the table," which included Bernardo and Victor, and that the trial court accordingly did not err in

refraining from giving a unanimity instruction for attempted robbery.

Under California law, a jury verdict in a criminal case must be unanimous.  *See People v.

Collins,* 17 Cal. 3d 687, 693 (Cal. 1976).  The United States Supreme Court, however, has never

recognized the existence of a comparable right under the federal Constitution.  On the contrary,

the Supreme Court has declared that "a state criminal defendant, at least in noncapital cases, has

no federal right to a unanimous jury verdict."  *Schad v. Arizona,* 501 U.S. 624, 634 n.5 (1991)

(plurality opinion); *see also Apodaca v. Oregon,* 406 U.S. 404, 406 (1972) (no Sixth Amendment

right to a unanimous verdict in a state criminal trial); *Johnson v. Louisiana,* 406 U.S. 356, 359

(1972) ("[T]his Court has never held jury unanimity to be a requisite of due process of law.").

Furthermore, jurors are not constitutionally required to reach unanimous agreement on

alternative theories of criminal liability.  *See Schad,* 501 U.S. at 631 ("We have never suggested

that in returning general verdicts . . . the jurors should be required to agree upon a single means

of commission . . . ."); *McKoy v. North Carolina,* 494 U.S. 433, 449 (1990) ("Plainly there is no

general requirement that the jury reach agreement on the preliminary factual issues which

underlie the verdict."); *see also Richardson v. United States,* 526 U.S. 813, 817 (1999) ("[A]

federal jury need not always decide unanimously which of several possible sets of underlying

brute facts make up a particular element, say, which of several possible means the defendant used to commit an element of the crime.").

Because there is no federal law requiring a jury verdict to be unanimous, Humphrey's contention does not state a claim under the federal Constitution.  Thus, as with any instructional error, Humphrey is entitled to habeas relief only if he can show that the trial court's failure to give a unanimity instruction "so infected the entire trial that the resulting conviction violates due process."  *Estelle,* 502 U.S. at 72 (quoting *Cupp,* 414 U.S. at 147).  Where the alleged error is failure to give an instruction, the burden on the petitioner is "especially heavy."  *Henderson v. Kibbe,* 431 U.S. 145, 155 (1977).  Humphrey has not met this burden and is not entitled to relief on this claim.

Claim Eight: Selection of upper term on Count 3

At sentencing, the trial court imposed the high term of a concurrent sentence of four years with respect to Count 3, assault with a firearm, "in light of the aggravated nature of the offense."  However, the court stayed that term pursuant to California Penal Code § 654.  Humphrey argues that the "aggravation" finding "was based on facts not found by the jury" and therefore "selection of the upper term was unauthorized."

The People conceded that the trial court's imposition of the upper term ran afoul of *Cunningham,* 549 U.S. at 289-90.   The appellate court concluded, however, that the error was harmless.

Under California's determinate sentencing law at the time of Humphrey's conviction, an upper sentence could be imposed only where the trial judge found an aggravating circumstance. *Id.* at 289.  In *Cunningham,* the Supreme Court held that an aggravation finding under the

California determinate sentencing law is one that must be made by a jury, and not a judge. *Id*. at 288-89.  The Ninth Circuit has held that *Cunningham* did not announce a new rule of constitutional law and could therefore be applied retroactively on collateral review. *Butler v. Curry*, 528 F.3d 624, 639 (9th Cir. 2008).  As the People conceded on direct appeal, Humphrey's sentence violated the prohibition set forth in *Cunningham* because the judge and not a jury found that the aggravated nature of the defense warranted the imposition of an upper term in Count 3.

However, the Court of Appeal's conclusion that the error was harmless is not contrary to, or an unreasonable application of, federal law.  Humphrey is entitled to relief only if the sentencing error in his case is not harmless.  *Id.* at 648 (citing *Washington v. Recuenco*, 548 U.S. 212, 218-19 (2006) (holding that sentencing errors are subject to harmless error analysis)).  This Court must therefore determine whether "the error had a substantial and injurious effect on [Humphrey's] sentence." *Id.* (citation omitted).  Under that standard, this Court must grant relief if it is in "grave doubt" as to whether a jury would have found the relevant aggravating factors beyond a reasonable doubt.  *Id.* (citing *O'Neal v. McAninch,* 513 U.S. 432, 436 (1995)).  "Grave doubt exists when, in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error." *Id.* (quoting *O'Neal*, 513 U.S. at 435) (internal quotation marks omitted).

Here, there is no "grave doubt" as to whether a jury would have found "aggravation" beyond a reasonable doubt because, as the Court of Appeal noted, none of the circumstances surrounding the crimes charged—the use of a firearm to attempt to rob the group of men playing penny poker, the pot valued only at a mere 20 dollars, and the death of Victor and the wounding of Bernardo—were contested.  Humphrey argued in his defense that he was not the perpetrator,

but the jury found that he was.  Under these circumstances, it is likely that had the issue been

presented to the jury, it would find that defendant assaulted his victims with a firearm which

made him eligible for the higher term.  Humphrey is therefore not entitled to relief on this claim.

Claim Nine: Restitution to Victor's wife

As part of his sentence, the trial court imposed restitution to Victor's wife in the amount

of $ 12,240 pursuant to California Penal Code § 1202.45.  Humphrey argues that the award was

"unauthorized" under state law and that the fine amounted to "an unconstitutional penalty for

exercising his right to trial."

Humphrey did not raise this exact claim in his appeal to the Court of Appeal or petition

for review filed with the California Supreme Court; rather, Humphrey argued that although

California law permits restitution to victims, which would include Victor's wife, it does not

permit restitution for wages lost as a "spectator" at trial.  The Court of Appeal resolved this

claim against Humphrey on state-law grounds.

To the extent Humphrey now argues that the order of restitution amounts to a vindictive

sentence, his claim is unexhausted.  Exhaustion of state remedies requires the petitioner to fairly

present federal claims to the state courts in order to give the state the opportunity to pass upon

and correct alleged violations of its prisoners' federal rights.  *Duncan v. Henry*, 513 U.S. 364,

365 (1995).  To have properly exhausted his state court remedies, Humphrey must have

presented both the legal arguments and the factual basis to the highest state court.  *See Peterson*

*v. Lampert*, 319 F.3d 1153, 1155-56 (9th Cir. 2003).  Unexhausted claims must be

dismissed.  *See Rhines v. Weber*, 544 U.S. 269, 275-78 (2005).

However, this Court need not rely on this basis as it may deny the petition on the merits notwithstanding the lack of exhaustion of state court remedies.  28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").  In this case, Humphrey's claim is without merit.

The Ninth Circuit has held that "§ 2254(a) does not confer jurisdiction over a state prisoner's in-custody challenge to a restitution order imposed as part of a criminal sentence." *Bailey v. Hill*, 599 F.3d 976, 982 (9th Cir. 2010).  Moreover, Humphrey's claim that the restitution order was unauthorized by California law is a state-law claim which is beyond the purview of this Court in a federal habeas proceeding.  *Swarthout v. Cooke*,  131 S. Ct. 859, 863 (2011); *see also Bell v. Cone*, 543 U.S. 447, 455 (2005).  Humphrey is therefore not entitled to relief on this claim.

Claim Ten: Cruel and unusual punishment

Humphrey lastly argues that his sentence was "disproportionately harsh, cruel and/or unusual" and that his sentence should be reduced from first-degree murder to second-degree murder.  The Court of Appeal denied Humphrey relief, concluding that his sentence "does not shock the conscience or offend fundamental notions of human dignity."

The Eighth Amendment, which applies to the States by virtue of the Fourteenth Amendment, *see Robinson v. California*, 370 U.S. 660, 675 (1962), provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." The Supreme Court has held that "the only relevant clearly established law amenable to the 'contrary to' or 'unreasonable application of' framework is the gross disproportionality

principle, the precise contours of which are unclear, applicable only in the 'exceedingly rare' and 'extreme' case." *Lockyer*, 538 U.S. at 73 (citation omitted).

In this case, the California courts upheld Humphrey's sentence of an aggregate term of 25 years to life plus 22 years where Humphrey was convicted of first-degree murder after confronting a group of acquaintances playing penny poker, threatening them, killing one and wounding another.  Humphrey was clearly the aggressor; he fired at the men in anger after they rejected his request to let him play and then rejected his subsequent request to take their pot, which was estimated at 20 dollars.  Humphrey's is not "the rare case in which a threshold comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality." *Ewing v. California*, 538 U.S. 11, 30 (2003) (quoting *Harmelin v. Michigan*, 501 U.S. 957, 1005 (1991) (Kennedy, J., concurring in part and concurring in judgment)).  The affirmance of Humphrey's sentence was not "contrary to, or [did not] involve[ ] an unreasonable application of" the as yet unclear parameters of the gross disproportionality principle.  *See Lockyer*, 538 U.S. at 73.  Humphrey is therefore not entitled to relief on this claim.

## V. CONCLUSION

Humphrey is not entitled to relief on any ground raised in his Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of Appealability.  *See* 28 U.S.C. § 2253(c); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree

with the district court's resolution of his constitutional claims or that jurists could conclude the

issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El*,

537 U.S. at 327).  Any further request for a Certificate of Appealability must be addressed to the

Ninth Circuit Court of Appeals.  *See* FED. R. APP. P. 22(b); 9TH CIR. R. 22-1.

      The Clerk of the Court is to enter judgment accordingly.

      Dated: March 11, 2014.

                                            /s/James K. Singleton, Jr._____
                                            JAMES K. SINGLETON, JR.
                                            Senior United States District Judge